Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL III

| | | |
|---|---|---|
| IVETTE DÍAZ PÉREZ<br><br>Peticionaria<br><br>V.<br><br>P & C AUTO, INC. H/N/C CARIBBEAN AUTO DISTRIBUTORS Y OTROS<br><br>Recurrida | KLCE202301476 CONS. KLCE202400011 | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.: BY2022CV04032 (402)<br><br>Sobre: BONO DE NAVIDAD Y OTROS |
| IVETTE DÍAZ PÉREZ<br><br>Recurrida<br><br>V.<br><br>P & C AUTO, INC. H/N/C CARIBBEAN AUTO DISTRIBUTORS Y OTROS<br><br>Peticionaria | | *Certiorari* procedente del Tribunal de Primera Instancia, Sala Superior de Bayamón<br><br>Caso Núm.: BY2022CV04032 (402)<br><br>Sobre: BONO DE NAVIDAD Y OTROS |

Panel integrado por su presidente, el Juez Figueroa Cabán, la Jueza Grana Martínez y el Juez Rodríguez Flores.

Grana Martínez, Jueza Ponente

**RESOLUCIÓN**

En San Juan, Puerto Rico, a 27 de marzo de 2024.

La peticionaria, Ivette Díaz Pérez, presentó el recurso KLCE202301476 en el que solicita que revisemos la denegatoria del Tribunal de Primera Instancia a dictar sentencia sumaria parcial. El peticionario, P & C Auto, presentó el recurso KLCE202400011 en el que solicita revisión de la misma resolución. Por esa razón, ordenamos la consolidación de ambos recursos.

**I**

Los hechos procesales pertinentes a este recurso son los siguientes.

La señora Díaz Pérez presentó una demanda enmendada contra P & C Auto por: (1) despido injustificado, (2) discrimen por edad, (3)

pago de horas extras y represalias, en la que alegó que comenzó a trabajar para la demandada el 1 de octubre de 2010 como Sales Trainer y CRM Consultant. La señora Díaz Pérez adujo que el demandado contrató sus servicios bajo la teoría de que sería una contratista independiente. No obstante, alegó que la relación siempre fue obrero patronal. La demandante arguyó que, el 30 de agosto de 2021, envió una carta al señor López, en la que reclamó que por ser empleada de la empresa tenía derecho al pago de horas extras, vacaciones y el período de alimento que no le había sido pagado. Sin embargo, el demandado nunca le reconoció el derecho al pago de horas extras, período de alimentos, licencia de vacaciones, de enfermedad, descanso semanal o bono de navidad.

La demanda enmendada incluyó una reclamación por represalias. La demandante argumentó que el demandado la despidió en represalia por sus quejas contra algunos empleados gerenciales. La señora Díaz Pérez arguyó que, el 3 de agosto de 2021, envió un mensaje al presidente de la demandada en el que se querelló porque algunos gerenciales estaban tomando represalias en su contra. La demandante explicó que fue objeto de represalias por una querella que hizo contra otro empleado que afectaba su ambiente laboral.

La señora Díaz Pérez sostuvo que, el 1 de octubre de 2021, fue despida injustificadamente de su empleo, a pesar de que nunca fue sancionada, su desempeño fue sobresaliente y trabajó incansablemente siete días a la semana, a altas horas de la noche incluyendo sábado y domingo. La demandante alegó que fue despedida, debido a las quejas que presentó contra otros empleados, su insistencia en remediar la situación laboral y por reclamar sus derechos.

La demandante presentó una moción de sentencia sumaria parcial en la que alegó que no existía controversia de una empleada con derecho a bono de navidad, horas extras, período de almuerzo,

vacaciones y enfermedad, dejadas de pagar y que probó un caso prima facie de represalias y discrimen por edad. La señora Díaz Pérez reconoció que los contratos de empleo del año 2012 al 2013 especifican que era una contratista independiente, pero alegó que también surgía de que tenía que trabajar 8 horas diarias de 7:00 a.m. a 4:00 p.m., 5 días a la semana. Según la demandante, no existe controversia de que, durante el tiempo que trabajó para la demandada, (1) la empresa le copiaba todos los correos electrónicos, (2) le daba instrucciones para vestir, (3) tenía empleados bajo su supervisión, (4) no podía trabajar con otros patronos, (5) recibía instrucciones como los demás empleados, (6) tenía oficina y lugar de trabajo provisto por el patrono, (7) el patrono le proveía todos los materiales para realizar su trabajo.

La demandada se opuso y pidió sentencia sumaria a su favor, debido a que la demandante es una contratista independiente, conforme a la presunción establecida en la Ley 4-2017. Según la demandada, no existe controversia de que: (1) la demandante tenía dos números de identificación patronal durante los años 2012, 2013, 2014 y 2015, (2) la demandante informaba en su la planilla de contribución sobre ingreso que era contratista independiente, (3) los contratos especificaban que realizaba tareas de contratista independiente dando adiestramiento a otros empleados, (4) tenía el control de su horario y podía realizar trabajos para otras compañías, (5) utilizaba sus equipos para trabajar y tenía libertad absoluta para diseñar los trabajos que iba a realizar y las métricas a utilizar y (6) la demandante reconoció en el Departamento del Trabajo que era contratista independiente.

La señora Díaz Pérez se opuso a la moción de sentencia sumaria del demandado, porque la Ley Núm. 4, *supra*, no aplica retroactivamente y no se cumplen los elementos para que se active la presunción de contratista independiente. La demandante adujo que la

presunción no se activa porque: (1) no tiene un número de identificación patronal y utilizó su número de seguro social en la planilla, (2) en las planillas del 2015 al 2021 utilizó su número de registro de comerciante, (3) reportó los servicios profesionales en la planilla de manera individual y no mediante una corporación ni entidad jurídica, (4) aunque declaró en las planillas del año 2012 al 2021 que su mayor fuente de trabajo era por cuenta propia, ni siquiera tenía número de seguro social patronal y (5) no había un contrato de contratista independiente vigente, porque el último contrato se otorgó en el año 2013, su duración era de 52 semanas y no se renovaba automáticamente.

El TPI declaró NO HA LUGAR ambas mociones de sentencia sumaria, debido a que existe controversia de hechos esenciales. No obstante, determinó que no existe controversia sobre los hechos esenciales siguientes:

(1)     Francisco Ramón López Fernández (señor López) es el presidente y único accionista de P & C Auto, Incorporated, parte demandada en este caso.

(2)     P & C Auto, Incorporated, haciendo negocios como Caribbean Auto, es una corporación que opera un establecimiento comercial de venta de automóviles en dos localidades: Carolina y Escorial.

(3)     Caribbean Auto es un "dealer" de autos nuevos marca Hyundai, Kia y Mitsubishi; también vende autos usados.

(4)     El propósito o fin comercial de Caribbean Auto es hacer dinero que la compañía sea exitosa, y lo hace a través de la venta de vehículos y servicio - o el mantenimiento - a esos vehículos.

(5)     Juan Aguayo (señor Aguayo) es el Gerente General de Ventas de Caribbean Auto. El señor Aguayo supervisa a los Gerentes de Venta, Gerentes de Financiamiento y vendedores.

(6)     El Departamento de BDC/CRM ofrece apoyo a Caribbean Auto en el área de ventas y servicio.

(7)     "BDC" significa "Business Development Center" y "CRM" significa "Customer Relationship Manager".

(8)     Los empleados del Departamento de BDC/CRM asignados al área de ventas controlan las llamadas

entrantes de los clientes y las asignan a los departamentos, y llaman a los clientes existentes u otros potenciales ("leads") para lograr que vengan al dealer a comprar un carro.

(9) Los empleados del Departamento de BDC/CRM asignados al área de servicio llaman a las personas (o clientes) para hacer citas para traer su auto a servicio (o mantenimiento) o les llaman para recordarles que tienen una cita de servicio.

(10) El Departamento de BDC/CRM interacciona operacionalmente con el Departamento de Ventas y con el Departamento de Servicio.

(11) El área de BDC/CRM es importante para el fin comercial de Caribbean Auto y ayuda a viabilizar sus fines comerciales que es la venta de vehículos y el servicio de esos vehículos.

(12) El 6 de septiembre de 2011, la señora Ivette Díaz Pérez y Caribbean Auto firmaron un contrato titulado Contrato de Servicios Profesionales.

(13) Según dicho contrato el horario de trabajo de la señora Díaz era de 7:30 a.m. a 3:30 p.m. y tenía libre los miércoles y no trabajaría en los días feriados, estatales y federales. Sin embargo, según el contrato Caribbean Auto no tenía que pagarle los días feriados a la demandante.

(14) Según dicho contrato cualquier asunto personal que la demandante tuviese y provocara ausentarse los días de trabajo tenía que notificar al señor Lopez y qué día reemplazaría dicha ausencia.

(15) Según el referido contrato, la demandante prestaría servicios profesionales como Sales Trainer y CRM Consultant, en el segmento de "Auto Sales" y Servicio. En esencia, adiestraba al personal de ventas de Caribbean Auto.

(16) Según dicho contrato "[l]a Consultora Actuará como asesor de CARIBBEAN AUTO y prestar[á] los servicios profesionales (en adelante, "los servicios profesionales") como Sales Trainer y CRM Consultant en el segmento de "Auto Sales" y Servicio. Sus responsabilidades consistirán en adiestrar a la fuerza de venta y trabajar la implementación del CRM, para mejorar el funcionamiento de la empresa".

(17) El 6 de septiembre de 2012, la señora Ivette Díaz Pérez y Caribbean Auto firmaron otro "Contrato de servicios profesionales".

(18) Este contrato era esencialmente igual al contrato firmado en el año 2011, pero cambiaba el horario de prestación de servicios, en adelante trabajaría de 7:00 a.m. a 3:00 p.m. Además, aunque aún tenía que reportar ausencia por condición extraordinaria

al señor López, no se especificó nada sobre reemplazar días. Igualmente, se modificó la cláusula de días feriados, omitiéndose la oración sobre la no responsabilidad del pago de días feriados por parte de Caribbean Auto.

(19) El 1 de septiembre de 2013, la señora Díaz y Caribbean Auto firmaron otro "Contrato de servicios profesionales". Este contrato es idéntico al suscrito en el 2012, pero cambia el horario de trabajo, el cual ahora será de 7:30 a.m. a 3:00 p.m.

(20) Los tres (3) contratos antes referidos fueron firmados por la demandante y Caribbean Auto, por conducto de su presidente, López.

(21) En los tres contratos se señalan fechas específicas en que la señora Díaz se ausentara de prestar servicios en Caribbean Auto.

(22) Los contratos tenían una duración de 52 semanas y ninguno de los (3) contratos se renovaba automáticamente.

(23) Luego del vencimiento del último contrato, la relación entre Caribbean Auto y la señora Díaz se mantuvo, a pesar de que no se volvió a firmar contrato alguno.

(24) Como parte de los servicios prestados sobre la implementación del CRM, la demandante enviaba cartas de agradecimiento a los clientes que requerían sellos de correo.

(25) El 12 de enero de 2015, la demandante le envió el siguiente correo electrónico a López:

*Te comento aunque sé que él tocará base contigo. Don Pablo me llamó porque quiere entrar en la segunda parte de BDC en Toyota para que ayude a Gilberto nuevamente pero serían de 3 a 4 medios días.*

*Le expliqué que tengo la competencia de mi hijo del 21 al 26 y que regreso a trabajar el 27.*

*Él se reunirá conmigo el jueves 15 en Bayamón. Además, hasta ahora sería el día 20, 28 y 2 y 29 de enero los tres días medio día.*

*Te dejo saber porque no me gusta trabajar nada sin tu consentimiento. Me dejas saber si contigo está bien.*
*Gracias, Ivette Díaz*

(26) El 2 de junio de 2020, la demandante envió un correo electrónico al señor López, mediante el cual le solicitó autorización para que William Muñiz, empleado de Caribbean Auto, trabajara el "Evento sobre ruedas" del 15 al 30 vía telefónica y correos electrónicos, a lo que López respondió: "ok conmigo".

(27) La señora Díaz recibía los correos electrónicos que se le enviaban a los empleados de Caribbean Auto. Entre los correos que se le enviaba[n] se encontraban correos anunciando los códigos de vestimenta, el pago de facturas, las instrucciones sobre la pandemia, así como la asistencia a entrenamientos y reuniones de personal gerencial. En al menos algunas ocasiones se esperaba que la señora Díaz cumpliese con estos correos electrónicos.

(28) La demandante debía someter facturas por horas trabajadas, no se le cuestionaba si trabajó las horas sometidas o no, pero si no sometía las facturas no se le pagaba.

(29) La demandante facturaba por sus servicios a razón de $38.95, por hora de servicio prestado.

(30) La Demandante sometía sus facturas a la Caribbean Auto los domingos, mediante correo electrónico.

(31) El periodo de pago era semanal; la demandante recibía su pago todos los viernes.

(32) A la demandante se le compensaba por los servicios prestados, en consecuencia, no recibía todos los viernes una cantidad fija, sino que dependía del tiempo que ella hubiese trabajado.

(33) A la señora Díaz se le pagaban sus facturas por los servicios prestados, mediante cheque, inicialmente y, luego, mediante transferencia bancaria ("ACH").

(34) El presidente de la Caribbean Auto, Francisco López Fernández, nunca le cuestionó a la señora Díaz sobre ausencias.

(35) El departamento de contabilidad de Caribbean Auto llegó [a] advertir que la señora Díaz sometía facturas donde a veces sometía 16, 17 y 18 horas diarias, pero, a pesar de eso, no se le cuestionó ni negó el pago de esas facturas.

(36) Caribbean Auto le notificaba anualmente a la demandante el ingreso devengado mediante un formulario 480.6SP o 480.6B, titulados Declaración Informativa - Ingresos Sujetos a Retención o Declaración Informativa - Servicios Prestados.

(37) De conformidad con los contratos suscritos el 6 de septiembre de 2011, el 6 de septiembre de 2012, y el 1ro de septiembre de 2013, las partes acordaron que todo material necesario que la demandante utilizara para los adiestramientos, CRM o cualquier otra causa, sería costeado por Caribbean Auto.

(38) La señora Díaz comenzó a tener problemas con el Sr. William Muñiz, entonces empleado de la Caribbean Auto. Debido a ello Caribbean Auto despidió al Sr. William Muñiz, en julio de 2021.

(39) Tras la terminación del Sr. William Muñiz, la Demandante acudió al Departamento del Trabajo para orientarse, por si este demandaba. La demandante acudió al Departamento del Trabajo a solicitud del Sr. Pablo Abreu, como resultado del despido del empleado William Muñiz, para que se orientara por si dicho empleado demandaba, ya que la demandante no era, para efectos de Caribbean Auto, su empleada.

(40) Caribbean Auto pagaba todos los materiales, incluyendo sillas, computadoras, monitores e impresoras que la señora Díaz necesitaba para dar sus adiestramientos.

(41) Caribbean Auto viabiliza la obtención de los resultados alcanzados por los asesores y/o consultores.

(42) Caribbean Auto le asignó a la demandante la siguiente dirección de correo electrónico: iDíaz@caribbeanautopr.com. La señora Díaz utilizaba dicho correo en el ejercicio de sus funciones para Caribbean Auto.

(43) Muchos de los adiestramientos que daba la señora Díaz para esta empresa eran en las instalaciones propiedad de Caribbean Auto.

(44) La demandante no alquiló oficina, espacio o equipo de trabajo alguno de Caribbean Auto para poder llevar a cabo su trabajo.

(45) A la demandante se le habilitó un espacio en la Compañía para poder bridar sus servicios de adiestramientos a la fuerza de ventas y un espacio para cuando ella acudiera a prestar sus servicios en los predios de la Compañía tuviera el espacio para así hacerlo.

(46) Durante el tiempo en que la señora Díaz rindió servicios para Caribbean Auto, ésta trabajó en julio y agosto de 2017, en Toyota de Bayamón a solicitud de Pablo Abreu, y del año 2013 al 2018, para P & CM Auto Inc., una entidad jurídica que dejó de operar en agosto de 2018, y cuyo único accionista era el señor López.

(47) La señora Díaz, al menos en algunas ocasiones realizaba entrevistas para contratar empleados nuevos para Caribbean Auto.

(48) También, en ocasiones, enviaba informes sobre el desempeño de gerentes y empleados de Caribbean Auto.

(49) La señora Díaz no tenía voz ni voto sobre cuál era el rumbo o el norte del Departamento de BDC/CRM.

(50) La señora Díaz adiestraba al personal, según la visión y misión que establecía Caribbean Auto.

(51) Para tomar una decisión informada como Presidente, el señor López evaluaba el insumo, las propuestas, alternativas y sugerencias de sus asesores, consultores y empleados. Dado lo anterior, es fundamental para la Compañía hacer disponibles a estos la información y el conocimiento que necesiten sobre la Compañía para viabilizar que puedan prestar los servicios para los cuales se les contrató.

(52) La señora Díaz, en ocasiones, enviaba recomendaciones al señor López y a otros directivos de Caribbean Auto, sobre premios y recursos dentro de la empresa.

(53) El Sr. Juan Aguayo es quien supervisa los gerentes de ventas, gerentes de financiamiento y vendedores.

(54) El 2 de febrero de 2017, la demandante recibió un correo electrónico del señor Aguayo, con copia al señor López, mediante el cual le solicitó cambiar la cuenta de Mazda a nombre de Mitsubishi, en la plataforma de internet Clasificados Online, a lo que este respondió ese mismo día: "cambio realizado según solicitado", informó las credenciales del "username" y la contraseña e indicó que les informaría a los vendedores.

(55) El 18 de mayo de 2017, Aguayo y Miguel Hernández, Gerente de Operaciones y Desarrollo de la marca de automóviles Kia, pautaron una reunión o adiestramiento de la marca Kia Motors con el equipo de ventas de Caribbean Auto, para el 30 de mayo de 2017.

(56) Para el año 2017 es la fecha en que Caribbean Auto obtuvo la marca KIA y comenzó a representarla. Por tal razón, al adiestramiento de KIA irían distintas personas.

(57) La señora Díaz tenía acceso a la información confidencial de Caribbean Auto y acceso al grupo de WhatsApp de dicha empresa.

(58) El chat referido en el inciso anterior fue creado por la demandante y ella era la administradora. El señor Aguayo también era administrador de dicho chat group.

(59) En el referido chat, los gerenciales intercambiaban información, sobre las ventas del día.

(60) La demandante usaba dicho chat para preparar informes de ventas de la compañía.

(61) Un "lead" para Caribbean Auto se refiere a cuando llega una oportunidad de ventas o de servicio, ya sea a través del teléfono, a emails, o redes sociales.

(62) Los "leads" llegan a través del Departamento de BDC/CRM, se recogen y se reparten entre los vendedores para que ellos hagan lo propio, dependiendo del orden de llegada de cada vendedor en la mañana.

(63) La señora Díaz recibía los "leads" a través del CRM y los repartía a los vendedores, para que los vendedores procedieran a trabajar con la venta o con la posible venta. Ella no era la única persona que hacía este trabajo.

(64) Cuando la señora Díaz entendía que había un vendedor que podía cubrir las funciones de vendedor, ella lo recomendaba para que pudiera pasar al área de ventas.

(65) La señora Díaz, también, les recordó a varios empleados del Departamento de BDC cada llamada era grabada, que estaban para realizar llamadas, no contestar, que cada uno debía tener la oportunidad de contestar, que el predio por llamadas se veía en los reportes y que algunos estaban por debajo de la norma establecida. Además, les recordó la forma en que tenían que completar sus llamadas, que las notas son muy importantes y que la misma persona no podía contestar en más de 3 ocasiones corridas. Además, les recordó que debían llegar a 25 citas diarias, 40 en el Departamento de Servicio y 65 los sábados.

(66) El 24 de agosto de 2020, la demandante les envió a los empleados del Departamento de BDC -mediante correo electrónico con copia a López, entre otros -el horario de los sábados para los meses de septiembre y octubre de 2020.

(67) Además, en dicho comunicado, la demandante les informó a los empleados que el Departamento de BDC trabajaría "overtime" 5 horas los sábados, por el mes de septiembre y que, dependiendo de su ejecución, en octubre de 2020 comenzarían con un día libre en la semana y "sábados sería su 5to día". Que eran los únicos empleados autorizados a trabajar "overtime", así como otras instrucciones y que "cuando estemos todos y todos entienden los sistemas de "overtime" debe bajar" y que, de existir algún cambio, lo notificará.

(68) Para julio de 2021, Pablo Abreu, consultor de Caribbean Auto, preparó un documento titulado Departamento "Customer Relation Management - CRM objetivos, estructura y funciones", a solicitud del señor López, luego de que este le diera instrucciones, pues, quería seguir desarrollando el Departamento de CRM, de ventas.

(69) Dicho documento se preparó, entre otras cosas, para tener un documento en donde estableciera cuál era la visión futura del Departamento del CRM, o el área de CRM, para seguir desarrollando el área de Ventas de CRM.

(70) El 30 de agosto de 2021, a través de su entonces representante legal, la señora Díaz le envió a Caribbean Auto una carta, mediante la cual reclamó ser su empleada, además, reclamó que se le adeudaban salarios no pagados, como horas extras, vacaciones y periodo de tomar alimentos.

(71) Caribbean Auto recibió la carta anteriormente señalada.

(72) Durante los periodos del 2012 a 2021, la Demandante presentó sus planillas de contribuciones sobre ingresos como contratista.

(73) Durante los años 2012, 2013, 2014, 2015, 2016, la señora Díaz reportó como oficina principal en sus planillas de contribución sobre ingresos como contratista, aquella con dirección en Fajardo, Puerto Rico, 00738, según se desprende del Anejo M correspondiente a las planillas radicadas en esos años contributivos.

(74) Durante los años en cuestión (2012-2021), la señora Díaz declaró en sus planillas que su fuente de mayor ingreso era Trabajo por Cuenta Propia.

(75) Existe un Certificado de Registro de Comerciante a nombre de Ivette Díaz Pérez, número 0320771-0018, como fecha de emisión de 7 de enero de 2020 y fecha de expiración: 27 de enero de 2022, correspondiente a la siguiente Actividad Comercial: otros Servicios Educativos, y el Certificado de Registro de Comerciante 0320771-0018, cuyo Código de NAICS es el 812990, correspondiente a la siguiente Actividad Comercial Los Servicios Profesionales Restantes.

(76) En la planilla de contribución sobre ingresos correspondiente al 2021, la señora Díaz declaró que la fecha de comienzo de operaciones fue el 10 de enero de 2011.

(77) La señora Díaz firmó a mano las planillas de contribución sobre ingresos para los años contributivos 2012 al 2014 y de manera electrónica para los años 2015 al 2021.

(78) El 11 de junio de 2019, la Demandante suscribió una carta señalando que prestaba servicios para la Caribbean Auto como contratista independiente.

El foro primario encontró que existía controversia sobre los hechos esenciales siguientes:

1. Si la señora Díaz trabajó para otros patronos durante el tiempo que prestó servicios para Caribbean Auto.

2. Si la señora Díaz revisaba y aprobaba la nómina de los empleados del Departamento de BDC/CRM y si esto era parte de sus funciones de manera regular.

3. Si la señora Díaz era empleada de Caribbean Auto o contratistas independiente.

4. Si la señora Díaz es empleada, si esta era gerencial o empleada regular y qué beneficios tenía derecho a recibir.

5. Si la señora Díaz, de ser empleada, fue objeto de discrimen por su edad y por represalia.

6. Si el 30 de agosto de 2021, a través de su entonces representante legal, por primera vez reclamó que se le adeudaban salarios no pagados, como horas extras, vacaciones y periodo de tomar alimentos, a pesar de que llevaba trabajando con la empresa desde el año 2011, o ella había reclamado en otras ocasiones este derecho.

7. Si la demandante alguna vez recibió compensación por horas extras, vacaciones, enfermedad y bono de navidad.

8. Si la señora Díaz, mientras prestó servicios para Caribbean Auto pagaba el Fondo del Seguro del Estado.

9. Si la carta firmada por la señora Díaz, el 11 de junio de 2019, la cual señalaba ser contratista independiente, se debió a Caribbean Auto, hace "unos cuantos años atrás" fue objeto de una auditoría por parte del Fondo del Seguro del Estado, y evitar que a Caribbean le cobraran $200,000.00, por incumplimiento.

El TPI enfatizó la ausencia de un contrato escrito vigente al momento del despido. Según el TPI, las partes suscribieron el último contrato en el año 2013, con una vigencia de 52 semanas y sin una cláusula de renovación automática. El foro primario reconoció que existía evidencia del control que ejercía el demandado sobre la demandante. Sin embargo, se negó a dictar sentencia sumaria porque: (1) los contratos no especifican que la demandante tenía que participar en las reuniones de la empresa, pero asistía a las reuniones gerenciales, (2) la demandante trabajaba ocho horas y tenía que notificarle al señor López sus ausencias y tardanzas, (3) las

alegaciones de que la demandante escogió el horario de trabajo, y de que facturó por horas que podía no haber trabajado y de que nunca fue cuestionada, debían estar sujetas a prueba, (4) el patrono alegó que la demandante traía sus propios materiales, pero no negó que se los proveía casi todos, incluyendo una computadora de escritorio y una portátil, (5) la demandante entrevistó personal para el patrono, pero tenía que utilizar el uniforme de la empresa, (6) no estaba claro si la demandante trabajó con otras empresas independientes, pero cuando lo hizo, fue por tiempo corto, (7) la demandante trabajó en una empresa controlada por el señor López en, al menos, una ocasión, (8) la demandante informó en la planilla que era contratista independiente y deducía los materiales de trabajo y otras partidas, (9) la demandante informó en el Departamento del Trabajo que era contratista independiente, (10) de la prueba presentada por ambas partes no surge que la demandante hubiese exigido el pago de vacaciones, almuerzo y horas extras en casi diez años y lo hizo cuando comenzaron los problemas en el año 2021, (11) la demandante alegó que el patrono le pidió que diera información falsa porque existía una investigación en su contra y podía recibir una multa de sobre $200,000.00.

Al TPI le quedó claro que la relación entre las partes es complicada y ninguna ha podido definirla correctamente y que muchos de los hechos esenciales envuelven elementos de credibilidad que ameritan ser dilucidados en un juicio ordinario.

Inconforme, la demandante presentó el recurso ante nuestra consideración en el que alegó que:

> ERRÓ EL TPI AL REHUSAR DICTAR SENTENCIA SUMARIA PARCIAL Y CONCLUIR QUE NO PODÍA EN ESTA ETAPA DETERMINAR SI LA DEMANDANTE ERA EMPLEADA DE CARIBBEAN AUTO.

> ERRÓ EL TPI AL REHUSAR DICTAR SENTENCIA SUMARIA PARCIAL Y NO RESOLVER QUE LA DEMANDANTE ERA UNA EMPLEADA NO EXENTA DEL

PAGO DE HORAS EXTRAS, LICENCIA DE VACACIONES Y ENFERMEDAD Y OTROS HABERES.

ERRÓ EL TPI AL REHUSAR DICTAR SENTENCIA SUMARIA PARCIAL Y NO CONCLUIR QUE LA DEMANDANTE ESTABLECIÓ UN CASO PRIMA FACIE DE REPRESALIAS.

ERRÓ EL TPI AL NO ENCONTRAR A CARIBBEAN AUTO INCURSA EN TEMERIDAD.

El demandado también acudió a este tribunal para cuestionar la determinación del foro primario. Según el demandado:

ERRÓ EL TPI AL DENEGAR LA MOCIÓN DE SENTENCIA SUMARIA DE CARIBBEAN AUTO.

ERRÓ EL TPI AL INCLUIR LAS DETERMINACIONES DE HECHOS 8, 9, 10, 11, 13, 14, 15, 16, 17, 18, 19, 27, 39, 40, 44, 46, 50, 57, 58, 60, 64, 65, 66 Y 67 POR ENTRE OTROS FUNDAMENTOS NO SER HECHOS PERTINENTES, NO ESTAR SUSTENTADOS EN EVIDENCIA ADMISIBLE, O ESTAR SACADOS DE CONTEXTO.

ERRÓ EL TPI AL NO INCLUIR DETERMINACIONES HECHOS QUE CARIBBEAN AUTO DEMOSTRÓ CON PRUEBA ADMISIBLE NO ESTÁN EN CONTROVERSIA.

ERRÓ EL TPI AL DETERMINAR QUE EXISTEN CONTROVERSIAS DE HECHOS PERTINENTES Y ESENCIALES CUANDO REALMENTE NO LO ESTÁN.

## II

El *certiorari* es un recurso extraordinario mediante el cual un tribunal de jerarquía superior puede revisar a su discreción una decisión de un tribunal inferior. 32 LPRA sec. 3491; *Rivera et al. v. Arcos Dorados et al.,* 2023 TSPR 65, 212 DPR ___ (2023); *Caribbean Orthopedics v. Medshape et al.,* 207 DPR 994, 1004 (2021); *800 Ponce de León v. AIG,* 205 DPR 163, 174 (2020); *Mun. Caguas v. JRO Construction Inc.,* 201 DPR 703, 710 (2019). Aunque la característica principal del recurso reside en el carácter discrecional del mismo, tal determinación no es irrestricta, está sujeta a los criterios señalados en la Regla 52.1 de Procedimiento Civil, 32 LPRA Ap. V, R 52.1. Advertimos que esta Regla ha sufrido modificaciones a través del tiempo para expandir el marco discrecional que ostentan los foros revisores en la expedición del recurso.

En la actualidad, la Regla 52.1 de Procedimiento Civil, *supra,* específicamente dispone que el recurso de *certiorari* solamente será expedido:

> [p]ara revisar resoluciones u órdenes interlocutorias dictadas por el Tribunal de Primera Instancia, cuando se recurra de una resolución u orden bajo las Reglas 56 y 57 o de la denegatoria de una moción de carácter dispositivo.
>
> No obstante, y por excepción a lo dispuesto anteriormente, el Tribunal de Apelaciones podrá revisar órdenes o resoluciones interlocutorias dictadas por el Tribunal de Primera Instancia cuando se recurra de decisiones sobre la admisibilidad de testigos de hechos o peritos esenciales, asuntos relativos a privilegios evidenciarios, anotaciones de rebeldía, en casos de relaciones de familia, en casos que revistan interés público o en cualquier otra situación en la cual esperar a la apelación constituiría un fracaso irremediable de la justicia.
>
> Al denegar la expedición de un recurso de *certiorari* en estos casos, el Tribunal de Apelaciones no tiene que fundamentar su decisión. Cualquier otra resolución u orden interlocutoria expedida por el Tribunal de Primera Instancia podrá ser revisada en el recurso de apelación que se interponga contra la sentencia sujeto a lo dispuesto en la Regla 50 sobre los errores no perjudiciales.
>
> 32 LPRA Ap. V, R. 52.1.

Superado el análisis al amparo de la Regla 52.1 de Procedimiento Civil, *supra,* el foro apelativo deberá auscultar los criterios de la Regla 40 del Reglamento del Tribunal de Apelaciones para guiar su discreción al intervenir con la resolución u orden interlocutoria recurrida. La Regla 40 dispone:

> El tribunal tomará en consideración los siguientes criterios al determinar la expedición de un auto de *certiorari* o de una orden de mostrar causa:
>
> A) Si el remedio y la disposición de la decisión recurrida, a diferencia de sus fundamentos, son contrarios a derecho.
>
> B) Si la situación de los hechos planteada es la más indicada para analizar el problema.
>
> C) Si ha mediado prejuicio, parcialidad o error craso y manifiesto de la apreciación de la prueba por el Tribunal de Primera Instancia.

D) Si el asunto planteado exige consideración más detenida a la luz de los autos originales, por los cuales deberán ser elevados, o de alegatos más elaborados.

E) Si la etapa del procedimiento en que se presenta el caso es la más propicia para su consideración.

F) Si la expedición del auto o de la orden de mostrar causa no causan un fraccionamiento indebido del pleito y una dilación indeseable en la solución final del litigio.

G) Si la expedición del auto o de la orden de mostrar causa evita un fracaso de la justicia.

4 LPRA Ap. XXII-B, R. 40.

La característica distintiva de este recurso se asienta en la discreción encomendada al tribunal revisor para autorizar su expedición y adjudicar sus méritos. *IG Builders et al. v. BBVAPR,* 185 DPR 307, 338 (2012). Sin embargo, la discreción no opera en el vacío y en ausencia de parámetros que la encaminen, sino que el foro apelativo cuenta con los criterios enumerados en dicha Regla para asistirlo y determinar si en un caso en particular procede que se expida el auto discrecional de *certiorari. Banco Popular de Puerto Rico v. Gómez Alayón,* 2023 TSPR 145, a la pág. 23, 213 DPR ___ (2023).

Los tribunales apelativos no debemos intervenir en las determinaciones del foro primario, a menos que se demuestre que el juzgador: (1) actuó con prejuicio o parcialidad, (2) incurrió en un craso abuso de discreción, o (3) se equivocó en la interpretación o aplicación de cualquier norma procesal o de derecho sustantivo. *Rivera y Otros v. Bco. Popular,* 152 DPR 140, 155 (2000); *Lluch v. España Service Sta.,* 117 DPR 729, 745 (1986).

**III**

La Regla 52.1 de Procedimiento Civil, *supra,* nos autoriza a intervenir en este recurso, debido a que se solicita revisión de la denegatoria a una moción de carácter dispositivo. No obstante, entendemos que lo correcto es que no intervengamos en esta etapa procesal, debido a que no encontramos indicio de que el foro primario haya incurrido en prejuicio, parcialidad o error manifiesto.

## IV

Por lo antes expuesto se deniega la expedición del auto de certiorari.

Lo acordó y manda el Tribunal y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones